IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No.: _____

AMERICAN HUMANIST ASSOCIATION and
KWAME JAMAL TEAGUE

v.

FRANK L. PERRY, in his official capacity as
Secretary of the NORTH CAROLINA
DEPARTMENT OF PUBLIC SAFETY, W.
DAVID GUICE, in his official capacity as
Commissioner of the Division of Adult
Correction and Juvenile Justice, GEORGE
SOLOMON, in his official capacity as Director
of Prisons, BETTY BROWN, in her official
capacity as Director of Chaplaincy Services,
GWEN NORVILLE, in her official capacity as
Deputy Director of Prisons, DAVID
MITCHELL, in his official capacity as
Superintendent of Lanesboro Correctional
Institution, and SARA R. COBB, in her official
capacity as Program Services Coordinator of
Lanesboro Correctional Institution

## **COMPLAINT**

Seeking to protect and vindicate their civil liberties and constitutional rights, including the constitutional requirement of separation of church and state and equal protection, the above-captioned Plaintiffs state as their complaint against the above-captioned Defendants the following:

1

## NATURE OF THE CLAIMS

1.     This action arises out of the Defendants': (1) refusal to allow a North Carolina inmate with sincerely held Humanist convictions to form a Humanist study group to meet on the same terms that Defendants authorize inmates of theistic religious traditions to meet; (2) refusal to allow inmates to identify as Humanists for assignment purposes. Defendants' policy and practice of discriminating against Humanist inmates because of their sincerely held convictions violates the Establishment Clause of the First Amendment of the United States Constitution as well as the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

2.     Plaintiffs seek injunctive and declaratory relief and damages under 42 U.S.C. § 1983 against the Defendants to redress these constitutional violations, together with recovery of attorney's fees and costs under 42 U.S.C. § 1988 (b).

## JURISDICTION AND VENUE

3.     This case arises under the First and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983 and presents a federal question within this Court's jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  The Court has jurisdiction to issue a declaratory judgment under 28 U.S.C. § 2201 and to provide injunctive relief and damages under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65.

4.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the Plaintiffs' claims occurred herein, and because the majority of defendants reside herein.

## PARTIES

5.     Plaintiff, the American Humanist Association ("AHA"), is a national nonprofit 501(c)(3) organization incorporated in Illinois with a principal place of business at 1777 T Street N.W., Washington, D.C. AHA is a membership organization with over 185 chapters and affiliates nationwide, including in North Carolina, and over 413,000 members and supporters, including members residing in North Carolina. AHA promotes Humanism and is dedicated to advancing and preserving separation of church and state and the constitutional rights of Humanists, atheists and other freethinkers. AHA brings this action to assert the constitutional rights of its members, including Humanist inmates in other institutions.

6.     Plaintiff Kwame Jamal Teague ("Teague"), inmate #0401897, is a resident of the State of North Carolina. Teague is an inmate in the custody of North Carolina Department of Public Safety (hereafter the "Department"), currently incarcerated at the Lanesboro Correctional Institution in Anson County, North Carolina ("LCI"). Teague was admitted to the Department's custody on or about May 31, 1996.

7.     Defendant Frank L. Perry is the Secretary of the North Carolina Department of Public Safety. He is sued in his official capacity. The secretary of the Department of Public Safety serves as the sole representative on the governor's cabinet for the state's law enforcement and emergency response community. The Department is responsible for the care, custody and supervision of all adults and juveniles sentenced after conviction for violations of North Carolina law. North Carolina houses approximately 38,000 inmates in 61 state prison facilities.

8.     Defendant Betty Brown is the Director of Chaplaincy Services for the Department. She is sued in her official capacity. North Carolina Prisons employs a Director of Chaplaincy Services to formulate and provide professional supervision of chaplaincy services.

3

The Director of Chaplaincy Services provides guidance and assistance for the religious activities to all the facilities within the North Carolina Prisons. According to Policy H.0100: "The Director of Chaplaincy Services is familiar with multiple religions, and coordinates those practices within DOP Policy and Procedures."

9.     Defendant George Solomon is the Director of Prisons for the Department. He is sued in his official capacity.

10.     Defendant Gwen Norville is the Deputy Director of Prisons for the Department. She is sued in her official capacity as Deputy Director.

11.     Defendant W. David Guice is the Commissioner of the Division of Adult Correction and Juvenile Justice, sued in his official capacity.

12.     Defendant David Mitchell is the Superintendent at LCI. He is sued in his official capacity.

13.     Defendant Sara R. Cobb is sued in her official capacity at Program Services Coordinator of LCI.

## FACTS

14.     Teague is a North Carolina state inmate currently housed at LCI who has sincerely held Humanist convictions. He considers Humanism to be his religion, which guides him through whatever life presents.

15.     LCI is a prison operated by the Department. It is located at 552 Prison Camp Road, Polkton, Anson County, North Carolina, 28135. (Mailing address is – PO Box 280, Polkton, N.C. 28135).

16.     LCI houses approximately 1,400 inmates.

4

17.     Teague is a member of the AHA and the Ethical Humanist Society of the Triangle in North Carolina.

18.     Humanism comforts, guides, and provides meaning to Teague in the way that religions traditionally provide such comfort, guidance, and meaning. By practicing Humanist principles in his relationships, he is confident that he is acting in a positive way.

19.     Humanist principles are promoted and defended by formal organizations such as the AHA (which provides a statement of Humanist principles in a document known as "Humanism and Its Aspirations," signed by 21 Nobel laureates and thousands of others), as well as the International Humanist and Ethical Union (which provides a statement of Humanist principles known as "The Amsterdam Declaration").

20.     Humanists celebrate various holidays including National Day of Reason (May 2), Darwin Day (February 12), HumanLight (in December) and other solstice-related holidays.

21.     Whereas Atheism is a religious view that essentially addresses only the specific issue of the existence of a deity, the Humanism affirmed by Teague is a broader worldview that includes, in addition to a non-theistic view on the question of deities, an affirmative naturalistic outlook; an acceptance of reason, rational analysis, logic, and empiricism as the primary means of attaining truth; an affirmative recognition of ethical duties; and a strong commitment to human rights.

22.     Humanism also has a formal structure akin to many religions, with clergy (usually known as "celebrants" who perform Humanist weddings, funerals, baby-welcoming ceremonies, counseling, and other functions commonly performed by clergy), chaplains (including a Humanist Chaplain at Harvard University), and with formal entities dedicated to the practice of religious Humanism, such as the American Ethical Union (based on the Ethical Culture

movement founded by Felix Adler in 1876) and the Society for Humanistic Judaism (founded by Rabbi Sherwin Wine in 1969), among others.

23.    AHA's adjunct organization, the Humanist Society, is a religious 501(c)(3) organization. The Humanist Society prepares Humanist Celebrants to lead ceremonial observances across the nation and worldwide, including weddings, memorial services, and other life cycle events. The Humanist Society started in 1939 by a group of Quakers who decided to form a nontheistic society based on similar goals and beliefs. In Humanism's tenets they saw the promise of a genuine union between science and ethics. The society was incorporated in December 1939, under the state laws of California as a religious, educational, charitable nonprofit organization authorized to issue charters anywhere in the world and to train and certify people, who upon endorsement would be accorded the same rights and privileges granted by law to priests, ministers, and rabbis of traditional theistic religions.

24.    Modern Humanism, also called Naturalistic Humanism, Scientific Humanism, Ethical Humanism, and Democratic Humanism, was defined by one of its leading proponents, Corliss Lamont, as "a naturalistic philosophy that rejects all supernaturalism and relies primarily upon reason and science, democracy and human compassion."

25.    Religious Humanism largely emerged out of Ethical Culture, Unitarianism, and Universalism. Today, many Unitarian Universalist congregations and all Ethical Culture societies describe themselves as Humanist in the modern sense. To serve personal needs, Religious Humanism offers a basis for moral values, an inspiring set of ideals, methods for dealing with life's harsher realities, a rationale for living life joyously, and an overall sense of purpose. Religious Humanism rejects the existence of a supreme being.

26.     Secular Humanism is an outgrowth of eighteenth century enlightenment rationalism and nineteenth century freethought. Many secular groups, such as the Council for Secular Humanism and the American Rationalist Federation, and many otherwise unaffiliated academic philosophers and scientists, advocate this philosophy.

27.     Secular and Religious Humanists both share the same worldview and the same basic principles. This is made evident by the fact that both Secular and Religious Humanists were among the signers of Humanist Manifesto I in 1933, Humanist Manifesto II in 1973, and Humanist Manifesto III in 2003.

28.     Humanists are united under the Humanist Manifesto III, also known as "Humanism and Its Aspirations." (A copy of the Humanist Manifesto III is attached herein as Exhibit 1). This document is a consensus of Humanist convictions. The ultimate concern for Humanists is to lead ethical lives of personal fulfillment that aspire to the greater good of humanity. The manifesto provides in part: "Humanists ground values in human welfare shaped by human circumstances, interests, and concerns and extended to the global ecosystem and beyond. We are committed to treating each person as having inherent worth and dignity, and to making informed choices in a context of freedom consonant with responsibility." The Humanist Manifesto III further provides: "We seek to minimize the inequities of circumstance and ability, and we support a just distribution of nature's resources and the fruits of human effort so that as many as possible can enjoy a good life."

29.     Teague wishes to meet with other Humanists who share his sincerely held Humanist convictions.

30.     When an inmate is admitted to a North Carolina prison, the inmate may designate a religious preference assignment. Staff will enter the religious preference information (RPI) into a system called OPUS ("Offender Population Unified System").

31.     OPUS is a real-time information system consisting of various sub-systems for processing inmate information. Data is owned by the appropriate sub-system, meaning that it is entered and updated by that sub-system. There is a shared access to this data among all the sub-systems. OPUS came online in phases, the first phase started in 1994.

32.     The facility chaplain or other designated staff is responsible for approving inmate religious requests and assignments.

33.     Teague wishes to identify as a Humanist on his official record with the Department.

34.     As of January 15, 2015, the Department recognizes the following religious assignments (hereafter referred to as "Recognized Religions"):

    i.   American Indian

   ii.   Asatru

  iii.   Assemblies of Yahweh

  iv.   Buddhism

   v.   Christian

  vi.   Hindu

 vii.   Islam

viii.   Judaism

  ix.   Moorish Science Temple

   x.   Rastafarian

xi. Wiccan

35. The above-listed religions are recognized in the Department's "RELIGIOUS PRACTICES REFERENCE MANUAL." A true and accurate copy of said Manual is attached herein as Exhibit 2.

36. The Department also recognizes the following sub-groups within several of the above religious assignments and permits inmates of the following to meet in their respective sub-groups:

i. Christian-Protestant

ii. Christian-Catholic

iii. Christian-Eastern Orthodox

37. Inmates who are members of Recognized Religions receive privileges, including but not limited to the following: (1) ability to meet with community-funded or volunteer chaplains on a regular basis; (2) ability to keep religious items in cells; (3) eligibility for enrollment in a religious correspondence course; (4) have community chaplain perform religious rites/rituals.

38. Inmates who are members of Recognized Religions are allowed to meet with their respective subgroups so that their communities can develop their ethical foundations with some sense of consistency in their teaching.

39. Humanist inmates cannot meet in groups in the same way inmates who are members of Recognized Religions can meet.

40. Humanist inmates in North Carolina prisons have no venue for meetings.

41. Atheist inmates in North Carolina prisons have no venue for meetings.

42. The Department does not recognize Humanist as an assignment option.

9

43. It is the Department's position that Humanism is not a religion.

44. The Department does not recognize Atheism as an assignment option.

45. The Department does not recognize Atheism as a religion or religious-equivalent.

46. At present, there is no Humanist meeting group at any North Carolina state prison.

47. At present, there is no Atheist meeting group at any North Carolina state prison.

48. Neither Humanism nor Atheism is an option for prisoner registration purposes (OPUS).

49. Upon information and belief, there are at least 20 Humanist and Atheist inmates at the Lanesboro Correctional Institution alone.

50. According to Department policy, "Inmates who wish to have incorporated a religious practice that is not recognized by North Carolina Prisons must submit a DC-572 Request for Religious Assistance form to the facility chaplain or other designated staff, who will then consult with the Chaplaincy Services Director regarding the availability of temporary accommodations in conjunction with the facility head or designee." H.0103.

51. A true and accurate copy of Policy H.0103 is attached herein as Exhibit 3.

52. Defendant Brown received at least two DC-572 forms submitted by Teague.

53. In or around January 2012, Teague requested to have his OPUS commitment changed to "Humanist" pursuant to Chapter H, Section .0104 of the Division of Prison's Policies and Procedures. H.0104(a).

54. In or around January 2012, Teague also filed a "Request for Religious Assistance" (Form DC-572) to establish Humanist group meetings.

55.     Both requests were denied on the stated grounds that the "Department of Public Safety does not recognize 'Humanism' as a religion." (Exhibit 4, attached herein).

56.     The Supreme Court in *Torcaso v. Watkins*, 367 U.S. 488, 495 n.11 (1961) recognized "Secular Humanism" as a religion for First Amendment purposes.

57.     On or about February 29, 2012, Teague filed a formal grievance complaint with the Department of Corrections regarding the prison's refusal to recognize Humanism as his OPUS designation and its refusal to authorize a Humanist meeting group.

58.     The Department dismissed Teague's grievance complaint.

59.     In March 2012, Teague sent a letter to Chaplain Betty Brown, Director of Chaplaincy Services, requesting information regarding the correct procedures to have Humanism recognized by the Department of Corrections.

60.     On March 8, 2012, Ms. Brown responded, advising Mr. Teague to prepare and file a "Request for Religious Assistance" (Form DC-572).

61.     Teague complied and filed a DC-572.

62.     Teague's DC-572 Form was denied by his case manager, Mr. Richard Boisvert, who told Teague that Humanism was not recognized in North Carolina prisons.

63.     In April 2012, Teague filed an administrative remedy appeal with the Department in connection with the prison's refusal to recognize Humanism and authorize a Humanist group.

64.     A true and accurate copy of the Department's response to Teague's administrative remedy appeal is attached herein as Exhibit 4.

65.     The Department's response to "step one" of the grievance form states: "Investigation into your complaint revealed that Mr Boisvert, Case Manager has explained to you that the Department of Public Safety does not recognize Humanism. You desire that a special

11

time be allowed for you to form a group. You are listed in Opus as Islamic. No one will disturb you in the orderly conduct of your religion. However, since the Department of Public Safety does not recognize 'Humanism' as a religion, no facilities will be provided same. There is no violation of the First Amendment Right, respecting an establishment of religion, or prohibiting the free exercise thereof. No further action is necessary at this time." (See Exhibit 4).

66.     The response to "step two" of the grievance form, signed April 16, 2012, stated: "Additional investigation reveals that staff has addressed inmate's complaint appropriately. This should resolve your grievance."

67.     On April 27, 2012, "step three" of Teague's administrative remedy form (DC-410B) was marked "received" by the Department of Correction.

68.     The "Finding and Disposition Order," which was signed on May 7, 2012, provided:

> Kwame Teague filed this grievance on February 29, 2012 at Warren Correctional Institution. He asserts that staff were not providing assistance to him in obtaining recognition of his religion
>
> Staff response indicated that an investigation of the inmate's complaint was conducted. Staff concluded that the inmate has not been treated unfair or outside the scope of correctional policies and procedures.
>
> This examiner has carefully reviewed the grievance and the response given by staff in the DC-410A response. From this review, I am convinced that staff has adequately addressed this inmate's grievance concerns. I adopt the facts found by the staff investigator.
>
> On this record, this inmate's allegations are insufficiently supported. Thus, this grievance is dismissed for lack of supporting evidence.

69.     On June 21, 2012, Teague sent another letter to Ms. Brown, writing in part:

> I am writing in response to your letter of March 8, 2012 relative to my request for information regarding the correct procedures to have my religion of secular humanism recognized by the Department of Correction as well as the State of North Carolina. You advised me to prepare and file a "Request for Religious

Assistance" (Form DC-572). This I did. However, Mr. Boisvert advised me that secular humanism is not recognized in N.C.

I currently appear in Inmate computer records as a Muslim. This does not reflect my faith. My religion is a form of secular humanism called Ethical Humanism. I am simply seeking information as to the steps I need to take to accomplish my objective of accurate reflection of my religion. I followed your advice, but it has resulted in the same answer (secular humanism is not recognized in N.C.) that caused me to initially write you.

Please help me in this matter. At this point, I am being denied the right of religious expression granted to Muslims, Christians and all other officially-recognized religious. I only want the same treatment that is afforded to these other faith groups.
Thank You,

70.    A true and accurate copy of Teague's letter to Brown, as quoted above, is attached herein as Exhibit 5.

71.    On July 9, 2012, the AHA sent a letter to Defendant Brown regarding the unconstitutionality of the Department's actions in refusing to recognize Teague's request to change his OPUS assignment to Humanist and its refusal to accommodate a Humanist meeting group. A true and accurate copy of this letter is attached herein as Exhibit 6.

72.    The 2012 AHA letter stated in part: "Humanism shares characteristics with many more traditional, widespread religions. It explores fundamental and ultimate questions of life and existence by appealing to science, reason, and our common humanity. Its beliefs are comprehensive in nature and encompass morality and meaning and purpose in life. Humanism even attempts to answer questions about the end of life. A document, the Humanist Manifesto, is a joint expression of humanist beliefs and goals. Humanist celebrants are trained to officiate marriages, funerals, and other life-cycle ceremonies. Organizations such as AHA provide structure and resources to members. Humanists often celebrate holidays such as the winter solstice and Darwin Day."

73.     The 2012 AHA letter further stated: "There is no doubt that Mr. Teague sincerely shares in these beliefs.  While incarcerated, he has explored humanism and come to embrace it as a means of accepting personal responsibility for his life.  He seeks the same rights and privileges other prisoners receive to explore and express his religious views. To deny him this is to discriminate against him in violation of the Constitution.  As you know, violations of the civil liberties of inmates may be remedied by bringing suit under 42 U.S.C. §1983.  It is my hope that no such suit will be necessary, and that you will do the right thing and change course.  We respectfully request that you allow Mr. Teague to change his religious identification to reflect his current beliefs.  In addition, we request that you work with Mr. Teague to meet his requests for religious assistance and accommodation, including access to resources, such as books and meeting space.  AHA would be more than happy to provide you any particular information and materials to regarding humanism that you may require as part of any such effort."

74.     On July 16, 2012, Ms. Brown responded to the 2012 AHA letter, stating in part that, "[u]pon recipet of the DC-572, members of the NC Religious Practice Committee will then review it and subsequently send it up the chain of command with recommendations."

75.     A true and accurate copy of Defendant Brown's response to the 2012 AHA letter is attached herein as Exhibit 7.

76.     At the time of Ms. Brown's July 2012 response, Teague's DC-572 application had already been denied.

77.     On May 15, 2013, Ms. Brown sent a letter to Teague, stating in part:

I responded to you via letter on March 15, 2013 regarding your DC-572 request to have "Humanism" as an accommodated faith practice by the North Carolina Department of Public Safety.  I also stated that our records determine that you changed your faith on February 11, 2013 to Buddhist.

Now on May 8, 2013 I am in receipt of a second DC-572 requesting "Humanism" again. In reviewing the information you provided, you are referring the "Ethical Humanism Society." We made several attempts to contact the "Ethical Humanism Society." Mr. Best from the information you provided on the DC-572 and have not been successful as of this date. I research information you submitted regarding the "Ethical Humanism Society." I called the number listed on the website for "Ethical Humanism Society", in Chapel Hill, NC and spoke to someone regarding your membership; he could not confirm you being a member. I continued to read the information and could not find the information needed to move forward with your request.

Mr. Teague the purpose of a DC-572 is to assist the Religious Practices Committee in making necessary determination in order to protect the Constitutional rights of inmates. The Religious Practices Committee process is to obtain authentic information and meet with legitimate representatives of all religious groups who have practitioners incarcerated in North Carolina Prison's to discuss how their religious needs can be met within the constraints of a prison environment. To this date we have not been able to authenticate your information.

Religious Practices Committee did not recommend "Ethical Humanism Society" as an established faith within the North Carolina Department of Public Safety, Prisons Section. We are proceeding with good will and asking the facility where you are housed to accommodate you through individual private devotion in your cell, with publications that you may purchase. This is the least restrictive means. However, any books ordered must be within the publication policy guidelines.

It is our desire and policy to offer all inmates their religious rights within the boundaries of legitimate penological custody and security objectives.

78.     A true and accurate copy of Defendant Brown's May 2013 letter is attached herein as Exhibit 8.

79.     Mr. Randall Best, the leader of the Ethical Humanist Society of the Triangle has an answering machine and no messages were ever left by Defendant Brown as of May 15, 2013.

(See Exhibit A, Declaration of Randall Best).

80.     On June 10, 2013, Mr. Randall Best sent a letter to Defendant Brown, which stated in part:

I have been leaving voice mail messages for you to call me for over a week now. I know that you must be busy but I look forward to hearing from you soon.

I would like to talk to you about Ethical Humanism, also known as Ethical Culture, and Mr. Kwame Teague's application to have Ethical Humanism recognized as an accommodated faith practice by the North Carolina Department of Public Safety.

Ethical Culture/Ethical Humanism, founded in 1876 in New York City by Felix Adler, is a religion free from supernatural elements that focuses on ethical relationships and practices. We are a recognized religious denomination by the U.S. Government.

Some of the history of Ethical Culture/Ethical Humanism can be found on the Wikipedia website at: http://en.wikipedia.org/wiki/Ethical_culture. The website for the Ethical Humanist Society of the Triangle, my congregation in Chapel Hill, is: http://www.ncethicalsociety.org.

I would be more than happy to talk to you about Ethical Humanism, Humanism in general, and answer any questions that you may have. The best way to reach me is on my cell phone, [redacted]. I hope to hear from you soon.

81.     A true and accurate copy of Mr. Best's letter quoted above is attached herein as Exhibit 9.

82.     After sending Defendant Brown the above-quoted letter and leaving her multiple voice messages, Brown eventually returned Mr. Best's call. However, she did not indicate that the prison would authorize a Humanist meeting group or allow Teague to identify as a Humanist for OPUS purposes.

83.     On November 26, 2014, the AHA sent a second letter to Defendants, informing them that their refusal to accommodate Humanist inmates is unconstitutional and warning them that a lawsuit would follow if they did not change their practices immediately.

84.     A true and accurate copy of this 2014 AHA letter is attached herein as Exhibit 10.

85.     As of February 19, 2015, Defendants have yet to respond to AHA's second letter.

86.     In addition to sending said letter, Plaintiffs' attorney, Monica Miller, made several phone calls to Betty Brown between January 8, 2015 and January 13, 2015, in an attempt to amicably resolve the issues complained of herein without resort to litigation. Ms. Miller left a

message with a woman in Ms. Brown's office yet Ms. Brown did not return her call. Ms. Miller also sent Ms. Brown a follow up email on January 12, 2015, attached herein as Exhibit 11, to which Ms. Brown never replied.

87. As of February 19, 2015, Defendants have yet to accommodate Teague's request to form a Humanist meeting group and his request to identify as a Humanist in OPUS.

88. Defendants' refusal to accommodate Humanist inmates with a Humanist group, while authorizing such groups for inmates of a wide array of religious traditions, including non-theistic traditions, is a clear violation of the Establishment Clause and Equal Protection Clause.

89. Defendants' refusal to recognize Humanism for OPUS purposes, while recognizing a wide array of religious traditions, including even non-theistic traditions, for OPUS purposes, is a clear violation of the Establishment Clause and Equal Protection Clause.

90. For instance, the Department recognizes Buddhism as a religion, which is a non-theistic tradition.

91. The reason that Humanist inmates were denied the opportunity to meet like Recognized Religious groups was not because the number of Humanist inmates desiring to meet was smaller than the number of inmates wishing to meet in other religious groups.

## CAUSES OF ACTION

## COUNT 1: VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT (U.S. CONST. AM. I; 42 U.S.C. § 1983)

92. All preceding allegations are incorporated herein by reference.

93. The actions of Defendants and their agents, servants, or employees, as described above, violate the Establishment Clause of the First Amendment. Said violations include, but are not limited to:

17

i.  Defendants' refusal to recognize Humanist as a religious assignment in OPUS.

ii.  Defendants' refusal to authorize a Humanist study group.

iii.  Defendants' refusal to permit a Humanist inmate to form a Humanist study group to meet with other Humanist inmates to study and discuss their commonly held convictions and principles relating to religion on the same terms the Defendants authorize groups for inmates of other faith traditions.

94.  Defendants' actions described above lack a secular purpose, have the effect of promoting, favoring and endorsing some religions over others and religion over non-religion generally, and result in an excessive entanglement between government and religion. Said actions also fail strict scrutiny because they lack a compelling governmental interest and the means used to achieve any said interest are not narrowly tailored.

95.  Defendants intentionally or recklessly violated Plaintiffs' well-settled constitutional rights under the Establishment Clause.

96.  Defendants acted under color of law in violating the First Amendment as described herein in violation of 42 U.S.C. § 1983.

## COUNT 2: VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT (U.S. CONST., AM. XIV; 42 U.S.C. § 1983)

97.  All preceding allegations are incorporated herein by reference.

98.  Defendants' refusal to recognize Humanist as a religious assignment violates the Equal Protection Clause of the Fourteenth Amendment.

99.  Defendants' refusal to permit a Humanist inmate to form a group to meet with other Humanist inmates to study and discuss their commonly held convictions regarding religion

on the same terms Defendants authorize groups for inmates of other faith traditions violates the Equal Protection Clause.

100.    Defendants' refusal to allow non-theistic inmates who identify as Humanist to meet on the same terms the Defendants authorize similarly situated theistic inmates to meet, including but not limited to those who identify as Catholic, Muslim, or Buddhist violates the Equal Protection Clause.

101.    Defendants' actions described above lack a compelling, important or even legitimate governmental interest therefore violating the Equal Protection Clause.

102.    Defendants intentionally or recklessly violated Plaintiffs' well-settled constitutional rights under the Equal Protection Clause.

103.    Defendants acted under color of law in violating the Equal Protection Clause as described herein in violation of 42 U.S.C. § 1983.

**WHEREFORE,** Plaintiffs request that this Court grant the following relief:

i.   A declaratory judgment that Defendants' actions described above violate the Establishment Clause of the First Amendment to the United States Constitution.

ii.   A declaratory judgment that the following actions of Defendants violate the Establishment Clause:

a.    Defendants' refusal to authorize a Humanist meeting group.

b.    Defendants' refusal to recognize Humanism as an assignment option for OPUS.

iii.   A declaratory judgment that the above actions of the Defendants':

a.    lack a secular purpose;

19

        b.    have the effect of endorsing, favoring, and preferring some religions over others, and in particular, theistic traditions over non-theistic traditions and religion over non-religion; and

        c.    result in excessive government entanglement with religion.

    iv.  A declaratory judgment that the Defendants' actions violate the Equal Protection Clause of the Fourteenth Amendment.

    v.  A declaratory judgment that the following actions of the Defendants violate the Equal Protection Clause:

        a.    Defendants' refusal to authorize a Humanist meeting group.

        b.    Defendants' refusal to recognize Humanism as an assignment option for OPUS.

    vi.  A declaratory judgment that the above actions of the Defendants lack a compelling, important or legitimate governmental interest in violation of the Equal Protection Clause.

    vii.  A declaratory judgment that the Defendants discriminated against Teague on account of his religious convictions in violation of the Equal Protection Clause.

    viii.  A declaratory judgment that Defendants' discrimination against Humanist inmates lacks a compelling, important or legitimate governmental interest in violation of the Equal Protection Clause.

    ix.  A declaratory judgment that Defendants intentionally or recklessly violated Plaintiffs' constitutional rights.

    x.  A permanent injunction ordering Defendants, their agents, successors, and any person in active concert with the Defendants to:

a. Authorize Humanist study groups in all Department prisons and allow such Humanist groups to meet on the same terms the Defendants authorize groups for inmates of other faith traditions;

b. Authorize Teague to meet in a Humanist study group on the same terms Defendants authorize for inmates of recognized faith traditions;

c. Authorize a Humanist study group upon the request of any inmate at any Department facility in which religious groups are permitted, and approve of said Humanist group without requiring inmates to file a formal request such as a DC-572 or administrative remedy appeal. Any such Humanist group must be provided with the same rights, privileges, and benefits of other recognized religious groups. Humanist study groups at BOP facilities must be permitted to have an outside volunteer under the same circumstances that outside volunteers are authorized for other religious study groups;

d. Recognize Humanism as a religious assignment option in OPUS; and

e. Recognize Humanism as an equivalent to already accepted religions in all Department facilities, such that no inmate shall be required to fill out a DC-572 or similar proposal to establish Humanist group meetings.

xi. A permanent injunction prohibiting the Defendants, their agents, successors and any person in active concert with the Defendants, from:

a. Refusing to authorize a Humanist study group to meet on the same terms the Department authorizes groups for inmates of other faith traditions;

b. Refusing to authorize an Atheist study group to meet on the same terms the Department authorizes groups for inmates of other faith traditions; and

c. Otherwise discriminating against Atheist and Humanist inmates.

xii.   An award of nominal damages to the Plaintiffs.

xiii.   An award to the Plaintiffs of their reasonable costs, disbursements and attorneys' fees as allowed by law from the Defendants pursuant to 42 U.S.C. § 1988.

xiv.   An award of such other and further relief as the Court shall deem just and proper.

Respectfully submitted this 25th day of February, 2015.

/s/ Monica L. Miller
MONICA L. MILLER
Attorney for Plaintiffs
American Humanist Association
1777 T Street N.W.
Washington, D.C. 20009
Telephone: (202) 238-9088
Facsimile: (202) 238-9003
Email: mmiller@americanhumanist.org
CA Bar: 288343 / DC Bar: 101625

DAVID A. NIOSE
Attorney for Plaintiffs
Law Offices of David Niose
348 Lunenburg Street, Suite 202
Fitchburg, MA 01420
Telephone: (978) 343-0800
Email: dniose@nioselaw.com
MA Bar: 556484/ DC Bar 1024530

/s/ W. Swain Wood
W. Swain Wood
N.C. State Bar No. 32037
J. Christopher Jackson
N.C. State Bar No. 26916
Attorneys for Plaintiffs
WOOD JACKSON PLLC
1330 St. Mary's Street, Suite 460
Raleigh, NC  27605
Telephone:  (919) 829-7394
Facsimile:  (919) 829-7396
Email: swood@woodjackson.com
cjackson@woodjackson.com
***Local Civil Rule 83.1 Counsel***