IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CT-3053-BO

| | |
|---|---|
| AMERICAN HUMANIST ASSOCIATION ) and KWAME JAMAL TEAGUE, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>FRANK L. PERRY, *et al.*, )<br>)<br>Defendants. ) | ORDER |

This matter is before the court upon the parties' cross-motions for summary judgment [DE-68, 83]. The issues raised have been fully briefed and are ripe for adjudication. For the following reasons, the court grants plaintiffs' motion for summary judgment and denies defendants' cross-motion for summary judgment.

**STATEMENT OF THE CASE**

On February 25, 2015, plaintiffs the American Humanist Association ("AHA")[1] and Kwame Jamal Teague ("Teague") filed a complaint pursuant to 42 U.S.C. § 1983 against defendants Frank L. Perry, David Guice, George Solomon, Betty Brown, Gwen Norville, David Mitchell, and Sara R. Cobb in their official capacities only. Defendants are current and former[2] employees of the North

---

[1] The AHA is a national nonprofit 501(c)(3) membership organization incorporated in Illinois with a principal place of business in Washington, D.C. Compl. [DE-1], ¶5. It promotes Humanism and is dedicated to advancing and preserving separation of church and state and the constitutional rights of Humanists. Id.

[2] Although the parties have not addressed the issue, the court is aware that several of the named defendants are no longer employed by DPS. However, under Federal Rule of Civil Procedure 25(d), "any misnomer not affecting the parties' substantial rights must be disregarded[,]" and "the absence of . . . an order [directing substitution] does not affect the substitution." See, e.g., Lankford v. Gelston, 364 F.2d 197, 205 n.9 (4th Cir. 1966). Thus, the reference in the caption to any defendant who has left office since the action commenced does not abate the action, and formal

Carolina Department of Public Safety ("DPS"), and involved in policy decisions related to the recognition of faith groups in the state's prisons. Plaintiffs allege that the DPS's disparate treatment of Humanists violates the Establishment Clause of the First Amendment and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Plaintiffs seek the entry of a declaratory judgment, permanent injunctive relief, nominal damages, and attorney's fees. Compl. [DE-1], p. 19-22. Specifically, plaintiffs seek the entry of a declaratory judgment finding, *inter alia*, that defendants' actions violated the Establishment and Equal Protection Clauses. Id. at 19-20. Similarly, plaintiffs request that the court enter a permanent injunction ordering, *inter alia*, DPS to recognize Humanism as a faith group and to authorize Humanists to meet in a study group on the same terms defendants authorize for inmates of recognized faith traditions. Id. at 20-21.

On July 28, 2017, the parties filed cross-motions for summary judgment [DE-68, 83]. Both motions were fully briefed, and the court conducted a hearing on January 24, 2018. These matters are now ripe for adjudication.

## STATEMENT OF FACTS

Teague was a Humanist[3] state inmate incarcerated at Lanesboro Correctional Institution ("Lanesboro") when he filed this action, but subsequently transferred to Nash Correctional Institution ("Nash"). Inmates admitted into DPS custody are asked their religious preference during intake. Pl Ex. 100 [DE-81-5], p. 12. These religious preferences are entered into the Offender Population

---

substitution of any successor is not required.

[3] According to plaintiffs, Humanists strive to bring about a progressive society where being good without a god is an accepted and respected way to live life. Pl. Ex. 13 [DE-72-13], p. 3. The ultimate concern for Humanists is to lead ethical lives of personal fulfillment that aspire to the greater good of humanity. Id. at 3-4.

Unified System ("OPUS"). Id. Inmates may change their OPUS faith group designation, but may only declare a faith group recognized by DPS. Id. at 1558-59.

DPS maintains a list of approved faith groups. Pl Ex. 6 [DE-72-6], pp. 24-30. DPS provides approved faith groups the resources necessary for group study and worship. Id. Approved faith groups are provided time and space for group study and worship even when neither is a requirement of the religion. Id. DPS policy states that "[i]nmates shall not organize nor conduct group meetings without prior approval of the facility head or designee." Pl. Ex. 6 [DE-72-6], p. 6. There is no minimum number of inmates required for recognition as a faith group.[4] Pl. Ex. 107 [DE-82-2], p. 39. Moreover, there are no written standards of any sort outlining the requirements for DPS to recognize a particular faith group. Pl. Ex. 107 [DE-82-2], p. 163. DPS does not recognize Humanism as a faith group. Def. Ex. C [DE-86-3]. Thus, at present, a Humanist inmate cannot assemble with other Humanist inmates to study and discuss Humanist values. Pl. Ex. 107 [DE-82-2], p. 58. Likewise, an inmate cannot designate Humanism as his preferred faith group in OPUS.

Teague first sought recognition of Humanism from DPS officials in 2012.[5] Def. Ex. A [DE-86-1], p. 59. After fully exhausting his administrative remedies, Teague was instructed to complete a "Request for Religious Assistance Form (DC-572)." Pl. Ex. 27 [DE-74-2], p. 1. Teague submitted a form DC-572 on September 18, 2012. Pl. Ex. 37 [DE-75-2]. In January 2013, DPS's Religious

---

[4] For example, during the time Teague sought recognition for Humanism, DPS approved Aquarian Christine Church Universal ("CCU") as a faith group despite only two people showing interest in CCU. Pl. Ex. 10 [DE-72-10], p. 2. Plaintiffs have identified several inmates interested in participating in Humanist group meetings. Pl. Ex. 88-95, [DE-80].

[5] Throughout Teague's attempts to obtain recognition as a faith group for Humanism from DPS, the AHA contacted DPS on Teague's behalf numerous times, providing additional information about Humanism and its leadership. Pl. Ex. 31 [DE-74-6]; Pl. Ex. 43 [DE-75-8]; Pl. Ex. 74 [DE-78-9]; Pl. Ex. 76 [DE-79-1], p. 3; Pl. Ex. 107 [DE-82-2], p. 134.

3

Practices Committee ("RPC") denied Teague's requests. Def. Ex. C [DE-86-3], p. 6. In support of its decision, the RPC noted: (1) it could not find a contact person for Humanism; (2) Humanism appeared to "be a philosophy of life" rather than a religion; (3) Humanist websites focused more on advocacy than faith practices; (4) Teague was represented by an attorney who worked for an advocacy group; (5) Teague was still listed in OPUS as a Muslim; and (6) Teague participated in religious services provided by other faiths. Id.

The RPC met again on March 5, 2013, to reconsider recognition of Humanism as a faith group. Pl. Ex. 50 [DE-76-5]. First, the RPC noted that Teague's request for recognition of Humanism was moot because Teague was now listed in OPUS as a Buddhist. Id. at 2. That notwithstanding, the RPC further concluded that Humanism failed to meet the standards for approval as a faith group "because there are many disciplines of Humanism," and "[t]here is no evidence . . . to conclude that there is a religious structure that includes a hierarchy of religious leaders." Id. at 3. Id. The RPC, however, acknowledged that Humanism promoted "a life of personal fulfillment that aspires to the greater good of humanity," and did not pose a security threat. Id. Ultimately, the RPC declined to recognize Humanism as a faith group, but determined that Teague could individually pursue his study of Humanism through "published literature of his preference at his own expense." Id. at 4.

On March 15, 2013, Teague was advised by DPS officials that his DC-572 request for recognition of Humanism as a faith group was still under review. Pl. Ex. 51 [DE-76-6]. He also was notified that DPS "records determine that you no longer have an interest for Humanism, because . . . you changed your faith to Buddhist." Id. However, Teague only changed his OPUS status from

4

Islamic to Buddhist because Humanism was not a valid selection, and Buddhism was the only nontheistic option other than "none." Pl. Ex. 110 [DE-82-5], p. 14.

Teague submitted another DC-572 form requesting recognition of Humanism as a faith group on April 26, 2013. Pl. Ex. 53 [DE-76-8]. After Teague submitted his request, prison officials sent him a series of additional questions beyond what is normally required. Pl. Ex. 53 [DE-76-8], pp. 4-7; Pl. Ex. 108 [DE-82-3], pp. 68-69. During this time, Teague also met with prison officials and provided them additional information regarding Humanism. Def. Ex. C, [DE-86-3], pp. 13-19. On May 15, 2013, Teague was informed by letter that his renewed request was denied. Pl. Ex. 55 [DE-76-10]. Prison officials, instead, indicated they would accommodate Teague "through individual private devotions in [his] cell, with publications that [he] may purchase." Id.

In September 2013, Randy Best, a Humanist chaplain and a leader in the Ethical Humanist Society of the Triangle in North Carolina, sought permission from DPS to visit Teague as his pastor and conduct Humanist services for other inmates. Pl Ex. 62 [DE-77-7]. It appears that the application was never formally approved. Pl. Ex. 98 [DE-81-3], p. 16.

On October 15, 2013, Teague submitted a third DC-572 form seeking recognition of Humanism as a faith group. Pl. Ex. 64 [DE-77-9]. He also renewed his request for weekly Humanist group meetings. Id. at 1-2. These requests were denied, and prison officials instead decided to accommodate Teague by providing him access to pastoral visits and Humanist publications.[6] Pl. Ex, 76 [DE-79-1], p. 3. Of note, in July 2015, the Federal Bureau of Prisons ("BOP") officially recognized Humanism as a faith group and provides the group two time slots per

---

[6] However, plaintiffs contend that prison officials denied Teague access to Humanist materials on at least one occasion. Pl Ex. 98 [DE-81-3], pp. 16-17.

week for worship and study. Pl. Ex. 18, [DE-73-3]. Likewise, the Department of Defense, the Internal Revenue Service, and the Department of Veterans Affairs also now recognize Humanism as a religion. Pl. Ex. 20 [DE-73-5].

## DISCUSSION

A. Mootness

Defendants argue that plaintiffs' claims for injunctive relief are moot because the actions described in the complaint primarily occurred at Lanesboro, and Teague has since been transferred to Nash. "[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." Rendelman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009) (citing Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007)); Taylor v. Rogers, 781 F.2d 1047, 1048 n. 1 (4th Cir. 1986)). However, an exception to the mootness doctrine exists for cases that are "capable of repetition, yet evading review." The "capable of repetition, yet evading review" doctrine "applies only in exceptional situations" where "two circumstances [are] simultaneously present: (1) the challenged action [is] in its duration too short to be fully litigated prior to a cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." Spencer v. Kemna, 523 U.S. 1, 17-18 (1998) (quotation omitted).

Thus, a transfer to a separate prison facility moots an inmate's requests for injunctive relief, so long as the transfer prevents the inmate from encountering those same allegedly unconstitutional prison conditions that gave rise to his original grievances. Turner v. Clelland, No. 1:15CV947, 2016 WL 6997500, at *13 (M.D.N.C. Nov. 30, 2016), report and recommendation adopted sub nom. Turner, Jr. v. Clelland, No. 1:15CV947, 2017 WL 913630 (M.D.N.C. Mar. 7, 2017). That "'is not

6

the case, however, where the inmate challenges a system-wide policy that applies wherever the inmate is next sent until his release.'" Id. (quotation omitted). Here, DPS's decision to not approve Humanism as a faith group is a system wide policy. Pl Ex. 49 [DE-76-4]. Even at Nash, Teague cannot identify as a Humanist in OPUS, and he is still not permitted to organize Humanist study groups. Moreover, AHA represents inmates located in several different facilities. Accordingly, plaintiffs' claims are not moot.

B. Standing

In addition, defendants argue that AHA lacks standing. An association has standing to sue on behalf of its members if they would have standing to sue on their own, the association seeks to protect interests germane to its purpose, and neither the claim asserted nor the relief requested requires its individual members to participate in the lawsuit. Am. Humanist Ass'n v. Maryland-Nat'l Capital Park & Planning Comm'n, 874 F.3d 195, 203-04 (4th Cir. 2017); see also Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977); ACLU of Ohio Found., Inc. v. DeWeese, 633 F.3d 424, 429 (6th Cir. 2011).

Here, Teague is a member of the AHA, and plaintiffs have identified at least eight inmates other than Teague who are Humanists and members of the AHA. Pl. Ex. 88-95 [DE-80]. DPS has denied requests from Humanist inmates other than Teague to change their status in OPUS to Humanist. Id. Similarly, other inmates sought to form a Humanist study group and the requests were denied. Id. Accordingly, the court finds that AHA has associational standing based on its representation of Humanist inmates incarcerated by DPS.

7

C.  Cross-Motions for Summary Judgment[7]

   1.  Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

   2.  Analysis

The parties disagree whether Humanism should be considered a religion. The court assumes, without deciding, that Humanism is a religion for the purposes of plaintiffs' Establishment and Equal Protection Clause claims. See Torcaso v. Watkins, 367 U.S. 488, 495 n. 11 (1961) ("Among religions in this country which do not teach what would generally be considered a belief in the

---

[7] The court notes that although defendants asserted the affirmative defense of qualified immunity in their answer, they have not argued that they are entitled to qualified immunity in their motion for summary judgment. Because defendants failed to raise the affirmative defense beyond a conclusory statement in their answer, the court finds that defendants have waived qualified immunity. See DePaola v. Clarke, No. 16-7360, 2018 WL 1219611, at *5 n. 4 (4th Cir. Mar. 9, 2018); Sales v. Grant, 224 F.3d 293, 296–97 (4th Cir. 2000) (finding that the defendants waived qualified immunity by failing to pursue it prior to remand even though the defendants technically pled "immunity" in their answer).

8

existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism and others."); Kaufman v. McCaughtry, 419 F.3d 678, 683-684 (7th Cir. 2005) (finding that inmate's atheism qualified as a religion for purposes of the First Amendment); see also, American Humanist Ass'n v. United States, 63 F. Supp. 3d 1274, 1283 (D. Or. 2014) (finding Secular Humanism to be a religion for Establishment Clause purposes). The court will now address plaintiffs' Equal Protection and Establishment Clause claims in turn.

    a.  Establishment Clause

"The Establishment Clause provides that 'Congress shall make no law respecting an establishment of religion . . . .'" U.S. Const. amend. I. It applies to state governments through the Fourteenth Amendment." Nusbaum v. Terrangi, 210 F. Supp. 2d 784, 787 (E.D. Va. 2002) (citing Board of Educ. v. Grumet, 512 U.S. 687, 690 (1994)). The parties disagree as to the standard governing plaintiffs' Establishment Clause claim. Plaintiffs argue that the strict scrutiny standard set forth by the United States Supreme Court in Larson v. Valente, 456 U.S. 228 (1982), applies, whereas defendants assert that the Lemon test is the appropriate standard. Subsequent to the Court's ruling in Larson, the Fourth Circuit held that "a court applies strict scrutiny only to statutes that make explicit and deliberate distinctions between different religious organizations." Liberty University, Inc. v. Lew, 733 F.3d 72, 101 (4th Cir. 2013) (internal quotations and alteration omitted); cf. Rouser v. White, 630 F. Supp. 2d 1165, 1195 & n.6 (E.D. Cal. 2009) ("the Larson test only applies where plaintiff has shown that the state law or action manifests a preference to some religions over others"). Plaintiffs have not identified any particular law or policy which explicitly and deliberately differentiates among religions. In fact, the record reflects that there are no written standards used to evaluate whether to recognize a faith group. Pl. Ex. 107 [DE-82-2] p. 163. Thus, the court

9

focuses its inquiry on the Lemon test. See Hernandez v. Comm'r of Internal Revenue, 490 U.S. 680, 695 ("Larson teaches that, when it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions. If no facial preference exists we proceed to apply the [Lemon test]."); see also, Am. Humanist Ass'n, 874 F.3d at 204; Kaufman, 419 F.3d at 684; Cardew v. Bellnier, No. 9:09-CV-775, 2010 WL 7139218, at *13-14 (W.D.N.Y. Dec. 9, 2010). Regardless of the standard applied, the court concludes that plaintiffs have demonstrated an Establishment Clause violation.

For government conduct to survive review under the three-part test set forth in Lemon v. Kurtzman, 403 U.S. 602, 612–13 (1971), it must first "have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; [and] finally, the statute must not foster, 'an excessive government entanglement with religion.'" Lemon, 403 U.S. at 612–13 (internal citations omitted); see also Lambeth v. Bd. of Comm'rs of Davidson Cty., NC, 407 F.3d 266, 268 (4th Cir. 2005) (stating that Establishment Clause challenges are "properly analyzed . . . under the Lemon test"). Notably, "a violation of even one prong of Lemon results in a violation of the Establishment Clause." Am. Humanist Ass'n, 874 F.3d at 206.

The court begins with the first prong of the Lemon test–whether the government action has a secular purpose. Here, plaintiffs challenge defendants' alleged refusal to recognize Humanism as a faith group and refusal to accommodate Humanist group meetings. It is undisputed that the RPC recognizes a number of other religious groups and permits inmate members of those groups to meet in groups for study and worship in the state's prisons. Defendants provide a variety of reasons why they denied faith group recognition to Humanism, which include: (1) lack of a centralized head, formal structure, or hierarchy of other religions; (2) a multi-discipline nature; and (3) a stronger

10

focus on advocacy, rather than faith practices. Pl. Ex. 49 [DE-76-4], p. 3; Pl. Ex. 50 [DE-76-5]; Def. Ex. C [DE-86-3], p. 6. However, DPS has recognized other faith groups, such as American Indian, Wicca, Hinduism, Asatru, Rastafarianism, and Buddhism, which also lack a centralized head or the formal structure or hierarchy of other religions. See Pl. Ex. 7 [DE-72-7]; see, e.g., Utt v. Brown, No. 5:12-CT-3132-FL, 2015 WL 5714885, at *3 (E.D.N.C. Sept. 29, 2015) ("The North Carolina Department of Public Safety ("DPS") recognizes Wicca as an approved religion in its Religious Practices Reference Manual.") (footnote omitted)). Similarly, many denominations of Christianity with diverse beliefs have been approved as faith groups. Pl. Ex. 2 [DE-72-2]. Furthermore, DPS conceded that, at best, participation in advocacy was a neutral factor. Pl. Ex. 106 [DE-82-2], p. 143.

DPS also denied recognition of Humanism because: (1) it could not find a contact person to discover more information about Humanism; (2) Teague was listed in OPUS initially as Muslim and later as a Buddhist; and (3) Teague participated in religious services provided by other faiths. Pl. Ex. 49 [DE-76-4], p. 3; Pl. Ex. 50 [DE-76-5]; Def. Ex. C [DE-86-3], p. 6. To the extent prison officials lacked information on Humanism, the record indicates that AHA's general counsel corresponded with DPS and offered to answer any questions. Pl. Ex. 31 [DE-74-6]. Additionally, Teague only identified as Buddhist because it was the available option that most closely resembled his Humanist beliefs because his preferred faith group was not available. Pl. Ex. 110 [DE-82-5], p. 14. In any event, DPS permits prisoners to attend religious services even when they do not subscribe to all of that faith group's beliefs. Pl. Ex. 106 [DE-82-2], p. 149; see Ben-Levi v. Brown, No. 5:12-CT-3193-F, 2014 WL 7239858, at *3 (E.D.N.C. Dec. 18, 2014) (noting that "[i]n general, DPS policy permits regular population inmates to attend any corporate worship service held at a facility"), aff'd, 600 F. App'x 899 (4th Cir. 2015). Attendance at services for a recognized faith group does

11

not preclude an inmate from having another religion recognized. Pl. Ex. 106 [DE-82-2], p. 149. Based upon the foregoing, defendants have not demonstrated a secular purpose for denying Humanism recognition as a religious group or for the decision to prohibit Humanist inmates from organizing group meetings.

The court next considers both the second and third factors of the Lemon test–whether DPS's policies regarding faith groups either advance or inhibit religion, and whether those policies foster an excessive government entanglement with religion. Lemon, 403 U.S. at 612-13. The process DPS uses to determine whether to recognize a particular faith group advances more traditional religions, but inhibits non-traditional religious groups such as Humanism. For example, Teague was subjected to additional requirements in his attempt to obtain DPS's recognition of Humanism as a faith group, without explanation. Pl. Ex. 53 [DE-76-8]; Pl. Ex. 108 [DE-82-3], p. 67-68. Indeed, it appears that Teague was asked to provide this additional information despite the fact that DPS had already decided to not recognize Humanism as a faith group. Pl. Ex. 42 [DE-75-7]; Pl. Ex. 50 [DE-76-5]. The record further reflects that DPS prison officials expressed skepticism and bias toward Humanism because it did not have a "religious tone" and its members "did not believe in a deity." Pl. Ex. 42 [DE-75-7], p. 1; Pl. Ex. 50 [DE-76-3], p. 1 (describing Humanism as a "weird faith" during a committee meeting); Pl. Ex. 79 [DE-79-4] (DPS e-mail with the subject "I know some chaplains will have real difficulty with this one.").

Defendants, additionally, have not set forth any evidence to support space, resource, or security concerns applicable to Humanist inmates, which do not apply equally to Christian, Muslim, Buddhist, or Wiccan inmates. See Kaufman, 419 F.3d at 684. Rather, on the record before the court, DPS's arbitrary decision to recognize some faith groups, and not Humanism, fostered an excessive

12

government entanglement with religion. For these reasons, the court concludes that DPS violated both the second and third factors of the Lemon test and, therefore, the Establishment Clause. See Ctr. for Inquiry Inc. v. Marion Circuit Court Clerk, 758 F.3d 869, 873-75 (7th Cir. 2014); Kaufman v. Pugh ("Kaufman II"), 733 F.3d 692, 694 (7th Cir. 2013) (holding prison officials "violated the Free Exercise and Establishment Clauses of the First Amendment by refusing [a prisoner's] request to create a religious study group dedicated to atheism, while allowing religious study groups dedicated to other religions."); Am. Humanist Ass'n, 63 F. Supp. 3d at 1282; Brown v. Livingston, 17 F. Supp. 3d 616, 631 (S.D. Tex. 2014) ("[Prison officials have] intentionally made it easier for Jewish inmates over Muslim inmates to have volunteer-led religious activities. That circumstance alone, in and of itself, constitutes a violation of the Establishment Clause.").

b. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. To that end, the Equal Protection Clause provides that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To establish an equal protection claim, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. [] If he makes this showing, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Veney v. Wyche, 293 F.3d 726, 730–31 (4th Cir. 2002) (internal quotation omitted); Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). In a prison context, this level of scrutiny is "whether the disparate treatment is reasonably related to [any] legitimate penological interests." Veney, 293

13

F.3d at 732 (internal quotation omitted). See also, Giarrantano v. Johnson, 521 F.3d 298 (4th Cir. 08) ("[W]e do not recognize prisoners as a suspect class.") (internal citation and quotation omitted).

Here, the record reflects that DPS authorizes meetings for some non-theistic religions but not Humanism. Therefore, plaintiffs have demonstrated that they have been treated differently from others with whom they are similarly situated. See also, American Humanist Ass'n, 63 F. Supp. 3d at 1284 ("Allowing followers of other faiths to join religious group meetings while denying Holden the same privilege is discrimination on the basis of religion."). Additionally, as discussed in more detail above, plaintiffs have provided evidence of discriminatory intent through DPS's bias against Humanism and the fact that prison officials required him to submit materials beyond what is typically required in support of his request for recognition of Humanism as a faith group. See Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979) (stating that discriminatory purpose "implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group") (internal quotation and citation omitted). Based upon the foregoing, plaintiff have established a prima facie equal protection claim.

Because plaintiffs have established a prima facie equal protection claim, the court proceeds to determine whether the alleged disparate treatment is reasonably related to any legitimate penological interests. In making this determination, the court must consider four factors: (1) whether there is a valid, rational connection between the policy and the penological interest; (2) whether an alternative means of exercising the right remains open to prison inmates; (3) the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources; and (4) the absence of ready alternatives that fully accommodate the prisoner's rights at

14

de minimis cost to valid penological interests. Morrison, 239 F.3d at 655. Importantly, "[a] policy will not be sustained "where the logical connection between the [policy] and the asserted goal is so remote as to render the policy arbitrary or irrational." Id.

Here, defendants argue that no Equal Protection violation exists because DPS's refusal to recognize Humanism was based on an evaluation of available space, resources, and security concerns. These are legitimate penological interests. Tehuti v. Robinson, No. 7:17CV00126, 2018 WL 502755, at *4 (W.D. Va. Jan. 22, 2018) ("In a First Amendment challenge, the defendants must show that the action or policy is reasonably related to legitimate penological interests, such as security, discipline and efficient use of limited resources."). However, defendants are unable to establish the first Morrison factor because there is no rational connection between DPS's cited interests and its refusal to recognize Humanism as a faith group. As stated, it does not appear from the summary judgment record that size or demand played a role in DPS's refusal to recognize Humanism. Indeed, other faith groups have been recognized with as few as two interested inmates. Pl. Ex. 10 [DE-72-10], p. 2. The record further does not establish that Humanism was denied recognition as a faith group based on space or resource concerns. Rather, when DPS rejected Teague's requests, they focused on the merits of Humanism as a religion rather than any space, resource, or security concerns. See, e.g. Def. Ex. C [DE-86-3], p. 6; Pl. Ex. 50 [DE-76-5], pp. 2-4. There, also, is no evidence in the record to support DPS's cited security concerns. See Morrison, 239 F.3d at 656; Couch v. Jabe, 679 F.3d 197, 201 (4th Cir. 2012) ("[T]he mere assertion of security or health reasons is not, by itself, enough for the Government to satisfy the compelling governmental interest requirement.") (citation omitted). Rather, DPS specifically concluded that recognition of Humanism did not pose a security threat. Pl. Ex. 50 [DE-76-5]. Finally, the BOP has approved

15

Humanism as a faith group and allots the group two time slots per week for worship and study. Pl. Ex. 18, [DE-73-3].

As for the remaining Morrison factors, defendants concede that Humanist inmates including Teague do not have an alternative means of exercising their rights nor are there ready alternatives to accommodate them, because unrecognized faith groups are not permitted to meet in small groups. Pl. Ex. 108 [DE-82-3], p. 26. Further, there is no evidence that accommodating plaintiffs' requests would have a negative effect on guards, other inmates, or the allocation of prison resources. Upon evaluating the Morrison factors, the court finds that the logical connection between DPS's decision to not recognize Humanism as a faith group and its stated legitimate policy goals is so remote as to render the policy arbitrary or irrational. Accordingly, defendants have violated the Equal Protection Clause.

D.      Injunctive Relief

Injunctive relief may be granted only upon plaintiffs' proof of constitutional violations. See Bolding v. Holshouser, 575 F.2d 461, 466 (4th Cir.), cert. denied, 439 U.S. 837, (1978); Mitchum v. Foster, 407 U.S. 225, 242 (1972). A federal court's power to intervene in the internal operations of state agencies is limited. See Florence v. Bd. of Chosen Freeholders, 566 U.S. 318, 325 (2012) ("The difficulties of operating a detention center must not be underestimated by the courts . . . . Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face."). In prison conditions cases, the Prison Litigation Reform Act ("PLRA") specifically provides that a court "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and

16

is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A), (g)(7) (defining "the term 'prospective relief' [to] mean[ ] all relief other than compensatory monetary damages"); see Plyler v. Moore, 100 F.3d 365, 369–70 (4th Cir. 1996).

Defendants' refusal to recognize Humanism as a faith group and to accommodate Humanist meetings violates the Establishment and Equal Protection Clauses. The court has considered the factors for evaluating whether to grant a permanent injunction set forth in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006), and finds that the factors are met. The court further finds that the injunctive relief set forth below is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation of the federal right. See 18 U.S.C. § 3626(a)(1)(A). Accordingly, the court GRANTS IN PART[8] plaintiffs' request for injunctive relief.

E.  Nominal Damages

The court next turns to plaintiffs' request for nominal damages. Having found that plaintiffs have suffered constitutional violations at the hands of defendants, they are entitled to nominal damages in the amount of $1.00. See Farrar v. Hobby, 506 U.S. 103, 112 (1992); Carey v. Piphus, 435 U.S. 247, 267 (1978); American Humanist Association v. Greenville Cty. School District, 652 F. App'x 224, 232 (4th Cir. 2016); Sangraal v. Godinez, No. 3:14-CV-661 SMY/RJD, 2018 WL 1318923, at *6 (S.D. Ill. Mar. 13, 2018).

---

[8] The court specifically declines to fully adopt plaintiffs' proposed permanent injunctive order because it contains language that is not narrowly tailored. For example, plaintiffs ask the court to prohibit defendants from "[o]therwise discriminating against Atheists and Humanists." Compl. [DE-1], p. 21. That language is too vague to be enforceable for the purposes of a permanent injunction.

17

## CONCLUSION

For the aforementioned reasons, court ORDERS as follows:

(1) Plaintiffs' motion for summary judgment [DE-68] is GRANTED and defendant's motion for summary judgment [DE-83] is DENIED;

(2) The court enters a permanent injunction ordering Defendants, their agents, successors, and any person in active concert with the Defendants: (a) to recognize Humanism as a faith group and as an assignment option for OPUS and all other prison records; and (b) permit Teague and other Humanist inmates to meet in a Humanist study group on the same terms defendants authorize for inmates of recognized faith groups;

(3) The court enters a declaratory judgment stating that defendants' have violated the Establishment and Equal Protection Clauses by refusing to recognize Humanism as a faith group and by refusing to offer Humanism as an assignment option for OPUS and other prison records. See 28 U.S.C. § 2201(a); Fed. R. Civ. P. 57;

(4) The court awards plaintiffs attorneys' fees pursuant to 42 U.S.C. § 1988. Counsel for plaintiffs is directed to file documentation in support of these damages not later than 30 days after the entry of this order. See Robinson v. Equifax Information Services, LLC, 560 F.3d 235, 243 (4th Cir. 2009). Counsel for defendants shall have 14 days thereafter to file a response. Any award of attorney's fees will be limited by § 1997e(d);

(5) The court shall retain jurisdiction to make any further orders that may be necessary to carry out these directives, but except to that extent, this proceeding is dismissed, with prejudice;

(6) The clerk of court is DIRECTED to close this case.

SO ORDERED. This the 29 day of March 2018.

*Terrence W. Boyle*
TERRENCE W. BOYLE
United States District Judge